RACHEL YEUNG (SBN 317361)
*ryeung@kslaw.com*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

MARK A. KIRSCH (admitted *pro hac vice*)
*mkirsch@kslaw.com*
JEFFREY S. ROSENBERG (admitted *pro hac vice*)
*jrosenberg@kslaw.com*
THOMAS E. SPIEGLER (admitted *pro hac vice*)
*tspiegler@kslaw.com*
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for Defendants Corcept Therapeutics Incorporated, Joseph K. Belanoff, William Guyer, Gary Charles Robb, and Sean Maduck*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CORCEPT THERAPEUTICS INCORPORATED SECURITIES LITIGATION | Case No. 3:26-cv-01525-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: February 23, 2027<br>Time: 2:00 p.m.<br>Judge: The Honorable Trina L. Thompson<br>Ctrm: Courtroom 09, 19th Floor |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on February 23, 2027, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Trina L. Thompson, in Courtroom 09, 19th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Corcept Therapeutics Incorporated, Joseph K. Belanoff, William Guyer, Gary Charles Robb, and Sean Maduck (collectively, "Defendants") will and hereby do move for an order dismissing the Amended Complaint for Violations of the Federal Securities Laws ("AC") (ECF No. 73) of Lead Plaintiffs Allegheny County Employees' Retirement System, Local #817 IBT Pension Fund, and City of Tallahassee Pension Plan (collectively, "Plaintiffs").

This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.*, on the grounds that Plaintiffs fail to state a claim on which relief can be granted.

Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the following Memorandum of Points and Authorities, the Request for Judicial Notice and Incorporation by Reference, the Declaration of Rachel T. Yeung filed concurrently herewith, and any other material and arguments as may be considered by the Court. Through this Motion, Defendants seek an order dismissing the AC with prejudice for failure to state a claim.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5(b) should be dismissed for failure to plead with particularity a material false statement or omission, or scienter.

2. Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) should be dismissed for failure to plead with particularity the use or employment of any manipulative or deceptive device or contrivance, and scienter.

3. Whether Plaintiffs' claim under Section 20(a) of the Exchange Act should be dismissed for failure to plead a predicate violation.

4. Whether Plaintiffs' claim under Section 20A of the Exchange Act should be

dismissed for failure to plead a predicate violation.

DATED: October 23, 2026

Respectfully submitted,

**KING & SPALDING LLP**

By: /s/ Rachel Yeung
RACHEL YEUNG (SBN 317361)
*ryeung@kslaw.com*
MARK A. KIRSCH (admitted *pro hac vice*)
*mkirsch@kslaw.com*
JEFFREY S. ROSENBERG (admitted *pro hac vice*)
*jrosenberg@kslaw.com*
THOMAS E. SPIEGLER (admitted *pro hac vice*)
*tspiegler@kslaw.com*

Counsel for Defendants CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, WILLIAM GUYER, GARY CHARLES ROBB, and SEAN MADUCK

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. The FDA Drug Approval Process ........ 3

B. Corcept, Korlym, and the Development of Relacorilant ........ 3

C. Corcept Refined Its Program and NDA in Consultation with FDA ........ 4

D. Defendants' Class Period Statements ........ 5

E. FDA's Complete Response Letter and the Stock Price Decline ........ 6

F. Plaintiffs' Claims ........ 6

III. LEGAL STANDARD ........ 7

IV. ARGUMENT ........ 7

A. Plaintiffs Fail to Plead Any Actionable Misstatement or Omission ........ 7

1. Truthful Statements of Fact About Trial Results (Stmts. 1, 3–4, 6–9, 11–13, 15–16, 18–22, 24, 33, 39–40, 44) ........ 8

2. Nonactionable Statements of Corporate Optimism (Stmts. 14, 28, 31–32, 34–35, 39, 42–44, 49–52, 55, 57, 60, 65, 68) ........ 10

3. Forward-Looking FDA Approval Predictions Protected by the PSLRA Safe Harbor (Stmts. 47–48, 50–53) ........ 11

4. Nonactionable Scientific Judgments/Opinions (Stmts. 1–46, 55, 61–83) ........ 13

5. Risk Factor Disclosures (Stmts. 84–88) ........ 18

6. Statements About FDA Review (Stmts. 54–60) ........ 19

7. Analyst Reports (Stmts. 10, 30, 49, 58, 59) ........ 21

B. Plaintiffs Fail to Plead a Strong and Compelling Inference of Scienter ........ 21

1. The Individual Defendants' Trading Does Not Support Scienter ........ 22

2. The Remaining Scienter Allegations Fare No Better ........ 25

C. Plaintiffs Fail to Plead Scheme Liability ........ 30

D. Plaintiffs Fail to Plead Control-Person or Insider-Trading Liability ........ 30

V. CONCLUSION ........ 30


KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018)....24

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022)....24, 25

*In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784 (9th Cir. 2017)....11

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)....8

*In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400 (S.D.N.Y. May 19, 2025)....11

*Chen v. Lyft, Inc.*, 762 F. Supp. 3d 909 (N.D. Cal. 2025)....12, 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)....13, 15

*Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)....9

*In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008)....12

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 189 F.4th 774 (9th Cir. 2026)....18, 19

*Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31 (1st Cir. 2017)....20

*Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618 (4th Cir. 2008)....22, 26, 30

*In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010)....12

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009)....7

*In re Dynavax Sec. Litig.*, 2018 WL 2554472 (N.D. Cal. June 4, 2018)....21

*Emps.' Ret. Sys. of Baton Rouge & Parish of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) .......... 14

*In re ESS Tech., Inc. Sec. Litig.*,
2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) .......... 28

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 4110430 (N.D. Cal. Aug. 15, 2025) .......... 8, 9

*In re Intel Corp. Sec. Litig.*,
2025 WL 1914884 (N.D. Cal. Mar. 4, 2025) .......... 11

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .......... 21

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......... 30

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013) .......... 15

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) .......... *passim*

*Lamontagne v. Tesla, Inc.*,
2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) .......... 11

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) .......... 23

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) .......... 10

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......... 17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... *passim*

*Mulligan v. Impax Labs., Inc.,*
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......... 25

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .......... *passim*

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .......... 22

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .................... 22, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .................... 13, 14, 15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .................... 7, 21

*Padnes v. Scios Nova Inc.*,
1996 WL 539711 (N.D. Cal. Sept. 18, 1996) .................... 14

*In re Palo Alto Networks, Inc. Sec. Litig.*,
2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) .................... 11, 28

*Pardi v. Tricida, Inc.*,
2024 WL 1056013 (N.D. Cal. Mar. 11, 2024) .................... *passim*

*Petersen v. TriplePoint Venture Growth BDC Corp.*,
2024 WL 5384678 (N.D. Cal. Aug. 7, 2024) .................... 26

*In re PetSmart, Inc. Sec. Litig.*,
61 F. Supp. 2d 982 (D. Ariz. 1999) .................... 29

*In re PG&E Corp. Sec. Litig.*,
806 F. Supp. 3d 962 (N.D. Cal. 2025) .................... 30

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2023 WL 4418886 (N.D. Cal. May 24, 2023) .................... 23

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) .................... 27, 29

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .................... *passim*

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) .................... 26, 29

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................... 12

*Reckstein Family Tr. v. C3.ai, Inc.*,
718 F. Supp. 3d 949 (N.D. Cal. 2024) .................... 30

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .................... *passim*

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................... 23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 25

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......... 25

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016) .......... 13

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) .......... 17

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
742 F. Supp. 3d 1003 (N.D. Cal. 2024) .......... 26

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .......... 22

*Simpson v. AOL Time Warner, Inc.*,
452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008) .......... 7, 30

*Sneed v. AcelRx Pharms., Inc.*,
2023 WL 4412164 (N.D. Cal. July 7, 2023) .......... 11

*Sundaram v. Freshworks Inc.*,
2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) .......... 18

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) .......... 13

*In re Taleo Corp. Sec. Litig.*,
2010 WL 597987 (N.D. Cal. Feb. 17, 2010) .......... 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 7, 21, 26, 30

*Thant v. Rain Oncology*,
2025 WL 588994 (N.D. Cal. Feb. 24, 2025) .......... 13

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) .......... *passim*

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .......... 23

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......... 11

*Wozniak v. Align Tech., Inc.*,
2011 WL 2269418 (N.D. Cal. June 8, 2011) .......... 23

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) .......... 23

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017) .......... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 7, 22, 27, 28

**Statutes**

Private Securities Litigation Reform Act of 1995
(codified as amended in sections of 15 U.S.C.) .......... *passim*

Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355) .......... 3

**Other Authorities**

17 C.F.R. § 240.10b5-1 .......... 2, 24

21 C.F.R. § 314.101 .......... 3

Fed. R. Civ. P. 9(b) .......... *passim*

## GLOSSARY

| Term | Definition |
|---|---|
| ¶ _ | Citations to the paragraph numbers in Plaintiffs' Amended Complaint (ECF No. 73) |
| AC | Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws, filed August 28, 2026 (ECF No. 73) |
| Class Period | The period from after market close on October 30, 2024 through before market open on December 31, 2025 |
| Control Period | August 29, 2023 to October 29, 2024 |
| Corcept or the Company | Corcept Therapeutics Incorporated |
| CRL | The Complete Response Letter for relacorilant, in the corrected version FDA publicly released on January 28, 2026 (Ex. 27), unless otherwise noted. FDA issued the original letter, which was not made public, on December 30, 2025. |
| Defendants | Corcept Therapeutics Incorporated, Joseph K. Belanoff, William Guyer, Gary Charles Robb, and Sean Maduck |
| DILI | Drug Induced Liver Injury |
| Ex(s). _ | Exhibits attached to the Declaration of Rachel T. Yeung filed concurrently herewith |
| Exchange Act | The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FDA | U.S. Food and Drug Administration |
| FE | Confidential witness "Former Employees" who purportedly made allegations Plaintiffs include in the AC |
| Individual Defendants | Joseph K. Belanoff, William Guyer, Gary Charles Robb, and Sean Maduck |
| NDA | New Drug Application |
| PDUFA Date | The date prescribed under the Prescription Drug User Fee Act for FDA to review and make a decision on an NDA |
| Plaintiffs | Lead Plaintiffs Allegheny County Employees' Retirement System, Local #817 IBT Pension Fund, and City of Tallahassee Pension Plan |
| PSLRA | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| Rule 9(b) | Rule 9(b) of the Federal Rules of Civil Procedure |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 |
| Rule 10b5-1 | SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1 |
| SEC | U.S. Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 20(a) | Section 20(a) of the Exchange Act |
| Section 20A | Section 20A of the Exchange Act |
| Stmt(s). _ | The statements Plaintiffs allege to be false or misleading, identified by the number assigned in the AC. *See* ¶¶ 230–359 & AC App. A. |

## I. INTRODUCTION

Corcept develops medicines that treat serious diseases by controlling the effects of cortisol, the body's main stress hormone. In 2012, Corcept obtained FDA approval for and brought to market "Korlym," the first FDA-approved medicine to treat patients with endogenous Cushing's syndrome, a rare and debilitating disorder that occurs when the body makes too much cortisol. Korlym has become an established treatment that has helped many thousands of patients manage the disease. As part of its mission to find ever more effective treatments, Corcept spent more than a decade developing "relacorilant," a next-generation treatment.

Corcept tested relacorilant in two large, late-stage ("Phase 3") clinical trials. The pivotal trial, "GRACE," met its primary endpoint, the main goal a trial is designed in advance to test. The second trial, "GRADIENT," did not, and Corcept promptly and accurately told investors so. Corcept submitted both trials to FDA, which accepted its NDA for review. In December 2025, FDA issued a CRL concluding that the evidence was "not sufficient to demonstrate the effectiveness of relacorilant." This case arises from that decision, which reflected a science-based difference of opinion between Corcept and FDA about how to interpret the trial results.[1]

The CRL does not say Corcept fabricated or misreported data; it describes a scientific disagreement. FDA stated in substance that GRACE's patient population was too narrow to permit extrapolation to a larger prospective patient population, found some results unreliable, and was unpersuaded by the GRADIENT supplemental analysis. Because it found the efficacy evidence insufficient, FDA could not complete its benefit-risk assessment, and invited Corcept to return with new clinical data. Those are judgments about the sufficiency of scientific evidence and its proper interpretation. Reasonable scientists routinely make such judgments, and regulators sometimes take a different view and invite further submission of evidence. This is not unusual, and it certainly is

---

[1] Historically, FDA treated CRLs for unapproved drugs as confidential and did not publish them. Ex. 29. In September 2025, FDA announced it would begin releasing CRLs "promptly after they are issued to sponsors." Ex. 30. The new policy drew challenges because, critics argued, it violates federal laws protecting confidential commercial information, abandons decades of agency practice without explanation, and releases letters, as here, without the context needed to understand them, "creating unjustified concerns about a drug's safety and effectiveness." Ex. 31 at 2–3, 16–17. Securities suits built on the text of newly published CRLs followed. *See, e.g.*, Ex. 33.

not evidence of fraud. To hold otherwise would turn every unfavorable regulatory decision into a securities claim, and as a result, discourage drug developers from publicly sharing clinical results.[2] The AC fails to meet the PSLRA's stringent pleading requirements for securities fraud.

**No Misstatement or Omission.** Plaintiffs quote nearly everything Defendants said about relacorilant during the Class Period—88 statements in all—and argue the CRL made it all misleading. But the statements make only a handful of points, and the AC fails to plead any were false or misleading with the particularity the PSLRA requires. Several simply report events—all accurately: GRACE met its primary endpoint, GRADIENT did not, Corcept submitted the NDA, and the review proceeded on FDA's schedule. Many are nonactionable optimistic statements. Others are forward-looking statements protected by the PSLRA's safe harbor—predictions of approval accompanied by warnings that the trials may prove inadequate to support approval. Numerous express Corcept's truthful opinions about what its data showed. Plaintiffs plead no facts suggesting Defendants did not believe those opinions. Five are not Defendants' words at all, but analysts' summaries of private conversations with unnamed "management," without pleading who said what, as required. The AC therefore fails to allege an actionable misstatement or omission.

**No Scienter.** Plaintiffs' scienter theory assumes that because Defendants allegedly knew FDA had raised concerns, they knew it would reject the NDA. But the AC identifies no report, meeting, communication, or admission showing any Defendant held that belief. The allegations instead describe executives who disclosed GRADIENT's failure, engaged in an iterative dialogue with FDA, submitted the challenged analysis and full clinical data to FDA, and warned investors the trials might prove inadequate for approval. The Individual Defendants' stock sales were modest and overwhelmingly under Rule 10b5-1 trading plans,[3] with Defendants holding millions of shares

---

[2] Since Plaintiffs filed this lawsuit, FDA has approved relacorilant, under the name "Lifyorli," for another use: treating platinum-resistant ovarian cancer. Ex. 34. And Corcept resubmitted its NDA for relacorilant to treat Cushing's syndrome, with additional analyses of the data from the original application at FDA's request. Ex. 21.

[3] A Rule 10b5-1 plan is a written plan, adopted when the insider is not aware of material nonpublic information, that fixes the amount, price, and dates of future sales in advance, or sets a formula for them, and leaves the insider no later discretion over the trades. 17 C.F.R. § 240.10b5-1(c)(1). Officers must certify their good faith when adopting a plan and wait through a "cooling-off" period before any sale. *Id.* § 240.10b5-1(c)(1)(ii)(B).

at the time the CRL became public. Plaintiffs' confidential witnesses never describe what FDA told any Defendant or what any Defendant believed, offering largely rumor and opinion. The remaining allegations—the Individual Defendants' positions, relacorilant's importance to Corcept, and industry-standard bonuses earned at NDA submission—show no knowledge of falsity or motive to mislead. The more compelling inference is that Defendants sincerely expected approval.

**No Scheme, Control-Person, or Insider-Trading Liability.** Plaintiffs' scheme liability claim rests on the same allegations and fails for the same reasons, and without a primary violation the control-person and insider-trading claims fail too.

## II. BACKGROUND

### A. The FDA Drug Approval Process

A company seeking to market a new drug must show through adequate and well-controlled clinical investigations that the drug is safe and effective. *See* 21 U.S.C. § 355(b)(1), (d). Phase 3 trial results form the core of an NDA submitted to FDA. ¶ 54. Within 60 days of receipt, FDA determines whether the NDA "is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101. FDA then evaluates the NDA and issues an approval or a "complete response letter" requesting additional information. *Id.* § 314.100. In doing so, FDA exercises "its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide." *Id.* § 314.105. FDA may, but need not, convene an advisory committee of outside experts. *Id.* §§ 14.160, 14.171; ¶ 145.

### B. Corcept, Korlym, and the Development of Relacorilant

Corcept is a pharmaceutical company headquartered in Redwood City, California, focused on developing medications to treat disorders by modulating the effects of cortisol. ¶¶ 35, 44. The Individual Defendants are current and former Corcept executives: its co-founder, Chief Executive Officer, and President (Belanoff); Chief Development Officer (Guyer); Chief Business Officer (Robb); and former Endocrinology Division President (Maduck). ¶¶ 36–39.

Corcept's principal commercial product is Korlym, a drug approved to treat patients with Cushing's syndrome, a rare condition caused by excessive cortisol. ¶¶ 47, 49. Corcept developed relacorilant as a next-generation cortisol modulator that avoids some of Korlym's side effects. ¶¶ 7,

53, 56. Corcept's Phase 1 trial for relacorilant began in 2014, its Phase 2 trial began in 2016, and Corcept subsequently advanced the drug into Phase 3 trials. ¶ 53.

Corcept designed a first Phase 3 trial for relacorilant called "GRACE." ¶ 63. In August 2018, before the trial began, Corcept announced that "[b]ased on FDA feedback," it had "developed response criteria for relacorilant's Phase 3 trial." ¶ 62. Plaintiffs allege that FDA wanted a placebo-controlled phase and that Corcept added one in response. ¶¶ 61, 402. Corcept began dosing patients in GRACE in November 2018. ¶ 63. GRACE consisted of two phases: (1) a 22-week open-label phase in which all patients received relacorilant, and (2) a randomized-withdrawal phase in which patients who achieved prespecified improvements were randomized to continue relacorilant or receive a placebo. ¶¶ 8, 65. Corcept described that design publicly years before the Class Period, ¶ 65, and GRACE's protocol stated that its design "accounts for relevant US FDA regulatory guidance," ¶ 197. GRACE enrolled 152 patients and studied the drug's effects across all etiologies (that is, the cause or origin) of Cushing's syndrome. ¶¶ 85, 99. GRACE originally had two primary endpoints: improvement in hypertension and improvement in glucose metabolism, ¶ 66, though as discussed below, the endpoints were subsequently refined.

In 2020, Corcept announced a second Phase 3 trial, "GRADIENT," which studied a smaller group of Cushing's patients in a fully randomized, double-blind, placebo-controlled design. ¶¶ 9, 71. Like GRACE, GRADIENT originally had two primary endpoints: improvement in hypertension and improvement in glucose metabolism. ¶ 71.

### C. Corcept Refined Its Program and NDA in Consultation with FDA

In August 2023, Corcept narrowed GRACE's primary endpoint to hypertension—that is, it dropped blood sugar as one of the two main results the trial was designed to test, so the trial would be judged on hypertension (blood pressure) alone—and posted the change on ClinicalTrials.gov. ¶ 81. GRACE's amended protocol and statistical analysis plan were posted there in May 2024. ¶ 68. On May 28, 2024, Corcept announced that GRACE had met its primary endpoint. ¶ 97; Ex. 16.

For years, Corcept had disclosed that GRACE alone would support the NDA. ¶¶ 9, 73. By mid-2024, Corcept announced that, "[b]ased on [its] discussions with the FDA," it expected to submit GRADIENT data "as part of [its] NDA" as well. ¶ 110. Robb explained publicly that "it

was after that back and forth" with FDA that Corcept "decided to include data from [its] GRADIENT trial . . . in the NDA submission." ¶¶ 112, 372. Analysts read the change the same way, with one reporting that "it appears the FDA may also want inclusion of efficacy from GRADIENT for a fuller picture of relacorilant." ¶ 112.

In September 2024, Corcept narrowed GRADIENT's primary endpoint to hypertension, matching GRACE, and posted the change on ClinicalTrials.gov. ¶ 115. "Management" told analysts the change came out of "consultation" and "alignment" with FDA. ¶¶ 115, 373. GRADIENT's amended protocol and analysis plan were posted in October 2024. ¶ 72.

On October 30, 2024, Corcept disclosed GRADIENT's results, stating that it "missed its primary endpoint" but patients who received relacorilant showed improvements in Cushing's symptoms compared to their own baseline, while patients who received a placebo did not. ¶¶ 118–19, 184; Ex. 17. Corcept characterized GRADIENT as providing "confirmatory evidence" that "support[ed] findings from" GRACE. *Id.*

Corcept submitted the relacorilant NDA on December 30, 2024, with GRACE as the pivotal study and GRADIENT as supportive. ¶¶ 112, 136; Ex. 18. On March 3, 2025, after reviewing the NDA submission, including the GRADIENT data, FDA formally accepted the NDA for review. ¶ 147; Ex. 19. FDA set a PDUFA Date of December 30, 2025. ¶ 139.

### D. Defendants' Class Period Statements

The Class Period is alleged to run from after market close on October 30, 2024 through before market open on December 31, 2025. ¶ 117. The AC challenges 88 statements from press releases, earnings calls, slide decks, SEC filings, and analyst reports. ¶¶ 230–359 & AC App. A. Stripped of repetition, they concern: (1) GRACE meeting its primary endpoint and specified patient improvements in each trial; (2) Corcept's belief that its data supported approval and relacorilant would become the standard of care; (3) expected FDA approval by year-end 2025; (4) the status of FDA's review; (5) relacorilant's tolerability; and (6) risk disclosures warning of adverse regulatory outcomes. The market knew investment in a developmental-stage drug was risky. Every Class Period Form 10-K and 10-Q warned that Corcept's trials "may prove inadequate to support marketing approvals," FDA "may require" more studies, trial changes, or analysis, and relacorilant

"may cause undesirable side effects" that could prevent approval. ¶¶ 349–53; Ex. 1 at 19–20; Ex. 2 at 31–33; Ex. 3 at 31–32; Ex. 4 at 33–34; Ex. 5 at 34–35. Each press release, earnings call, and slide deck included a forward-looking statement disclaimer acknowledging these same risks and directing investors to the risk factors. *E.g.*, Ex. 17 at 4; Ex. 22 at 4; Ex. 26 at 2.

**E. FDA's Complete Response Letter and the Stock Price Decline**

On December 30, 2025, FDA issued a CRL declining to approve relacorilant and requesting additional evidence of effectiveness. ¶ 171. Corcept disclosed the CRL the next morning in a press release, stating that it would "meet with the FDA as soon as possible to discuss the best path forward." *Id.*; Ex. 6 at 1. That day, Corcept's stock price declined from $70.20 to $34.80. ¶ 173. FDA publicly released a "corrected" version of the CRL on January 28, 2026. ¶¶ 171 n.3, 224–28; Ex. 27. The CRL identified a "[p]ath forward," invited Corcept to submit new clinical data, and said FDA was "open to meeting" to discuss a further trial. Ex. 27 at 4.

**F. Plaintiffs' Claims**

The AC alleges that the Class Period statements were "materially false and misleading" and "omitted material information necessary to make the statements not misleading." ¶ 230. Plaintiffs identify three categories of information that Defendants allegedly failed to disclose: (a) FDA had privately warned Defendants "on several occasions" of concerns about the adequacy of the clinical development program, including that GRACE's enriched trial design would overstate relacorilant's effectiveness in the broader patient population, and told them to "expect significant review issues," ¶¶ 190, 192–209, 220–21; (b) Defendants' GRADIENT efficacy claims were based on a post-hoc analysis of a data subset not contemplated by the trial's prespecified statistical analysis plan, conducted after the trial failed its primary endpoint, ¶¶ 180–91; and (c) 4 out of 303 patients in the trials experienced probable drug-induced liver injury, ¶¶ 210–19. Plaintiffs further allege Corcept's risk factor disclosures were misleading because they presented as hypothetical risks that had already materialized. ¶¶ 354–58.

Against all Defendants, Plaintiffs assert claims for securities fraud under Section 10(b) and Rule 10b-5(b) (Count I) and scheme liability under Rule 10b-5(a) and (c) (Count II). Against the Individual Defendants only, Plaintiffs also assert claims for control-person liability under

Section 20(a) (Count III) and insider-trading liability under Section 20A (Count IV).

## III. LEGAL STANDARD

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead with particularity that Defendants made a material misrepresentation or omission of fact, with scienter, that caused Plaintiffs' economic losses. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Section 10(b) claims are subject to Rule 9(b)'s additional particularity requirement, which demands that plaintiffs plead the "who, what, when, where, and how" of each alleged misrepresentation. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–05 (9th Cir. 2014). The PSLRA, which Congress enacted in significant part to curtail fraud-by-hindsight suits, imposes still more rigorous requirements. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

To plead falsity, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, for allegations made on information and belief "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). They must also allege particularized facts demonstrating that the statements were materially "false or misleading at the time they were made." *Rigel*, 697 F.3d at 876. Plaintiffs must further "state with particularity facts giving rise to a strong inference" that each defendant "acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A); *Apollo*, 774 F.3d at 607—scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).

To plead scheme liability, Plaintiffs must satisfy the same elements as a misstatement-based claim, including the use or employment of a manipulative or deceptive device or contrivance and scienter. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). They must also plead that each Defendant, in furtherance of a scheme to defraud, "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008).

## IV. ARGUMENT

### A. Plaintiffs Fail to Plead Any Actionable Misstatement or Omission

Plaintiffs challenge 88 statements but fail to plead a single statement or omission that

satisfies the PSLRA's "exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).[4]

**1. Truthful Statements of Fact About Trial Results (Stmts. 1, 3–4, 6–9, 11–13, 15–16, 18–22, 24, 33, 39–40, 44)**

Many challenged statements truthfully reported what Corcept's trials showed. A true statement is actionable only if it omits facts that make it misleading. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The securities laws impose no "freestanding completeness requirement." *Id.* Plaintiffs contend the same thing was missing from every trial-results statement: FDA's pre-submission concerns about the clinical program. ¶ 250. But courts consistently hold that drug developers need not disclose FDA's interim feedback when reporting trial results. *See, e.g.*, *Homyk v. ChemoCentryx, Inc.*, 2025 WL 4110430, at *6–7 (N.D. Cal. Aug. 15, 2025) (collecting cases). Investors "would fully expect that [a drug developer] and the FDA were engaged in a continuous dialogue 'about the sufficiency of . . . the clinical trials and that inherent in the nature of [such] a dialogue are differing views.'" *Id.* at *6 (quoting *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016)). There is "no general requirement under the securities laws for a company to engage in a rolling, communication-by-communication disclosure of every detail arising from the back-and-forth dialogue with the FDA . . . or to adopt the FDA's position as correct and share it with the public when discussing its product." *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *7 (N.D. Cal. Mar. 11, 2024). Courts reject this theory even where FDA had "repeatedly indicated its disagreement" with the company's approach. *Id.* at *6–7.

**a) GRACE met its primary endpoint.** Several statements report that GRACE "met its primary endpoint." ¶ 250. The AC concedes the CRL acknowledged that was true. ¶¶ 225, 250. Plaintiffs' theory is that the statements were misleading without more context. GRACE studied an "enriched" population: only patients who responded to relacorilant in the trial's first phase moved

[4] Many challenged statements combine distinct assertions. Defendants address each assertion under the doctrine that applies to it, so a statement may be addressed in more than one section below. Where this brief identifies particular statements by number in discussing a category, those citations are illustrative, not exhaustive. To assist the Court, Defendants have attached a chart summarizing the deficiencies in each claimed misstatement and the corresponding section of this brief addressing that ground. *See* App. 1.

on to the placebo-controlled phase. Plaintiffs contend the results therefore overstated how well the drug would work in the broader patient population. *Id.* They also allege FDA had warned Corcept about that design and told it GRACE alone would likely not be enough for approval. ¶ 250. So, Plaintiffs argue, Corcept could not report GRACE's result without also disclosing FDA's concerns.

That theory fails because the supposedly missing context was already public. Corcept described GRACE's enriched, randomized-withdrawal design to investors years before the Class Period. ¶ 65. Corcept also posted its trial design, protocol summary, outcome measures, and endpoint changes on ClinicalTrials.gov. ¶¶ 68, 72, 81; Ex. 32. And notably, FDA's own guidance, on which the AC relies, ¶¶ 196–98, 206, 412, states FDA may approve drugs "whose effectiveness has been demonstrated primarily or even solely in enriched populations," Ex. 28 at 33. Investors therefore knew how GRACE was designed and that FDA could approve a drug based on that design. Reporting that the trial met its endpoint did not suggest anything different.

Courts have repeatedly rejected the theory that a company must disclose FDA's ongoing feedback about trial design when reporting results. In *Homyk*, the court found no "serious conflict between the FDA's interim, albeit repeated, concerns" about a Phase 3 trial endpoint and the company's accurate statements that the trial had achieved it. 2025 WL 4110430, at *10 (quoting *Sanofi*, 816 F.3d at 212). Because the company "accurately described how [the trial] achieved its primary endpoints," disagreement with trial design, including FDA's own disagreement, "does not by itself create an actionable omission." *Id.* at *11; *see Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809, at *6 (N.D. Cal. Nov. 25, 2015) (statements that trials met their primary endpoints were "quite literally true" and gave "an accurate snapshot" of pre-NDA submission work). So too here.

**b) GRADIENT's results.** Defendants disclosed truthfully that GRADIENT patients showed improvements that were "clinically meaningful" and/or "statistically significant" "compared to baseline, while patients who received the placebo did not." ¶¶ 254, 256–57, 259–63, 266 (Stmts. 13, 15–16, 18–22, 24). Plaintiffs do not allege those within-arm results (where improvement is measured against a patient's baseline, not a placebo group) were misreported; they say the statements implied GRADIENT succeeded. ¶¶ 267–69. But Corcept disclosed in the same release that GRADIENT "did not achieve its primary endpoint," ¶¶ 118–19, 184, and reported that

the comparison to placebo "was not statistically significant," Ex. 2 at 18. A statement describing improvement from baseline made alongside disclosures that the placebo comparison failed cannot mislead a reasonable investor about which test succeeded. Plaintiffs' further contention that the supporting analysis reached only "nominal" significance in a subset of patients, ¶¶ 188, 191, 300, likewise identifies no misreported number; it is a dispute about how much weight a disclosed, secondary analysis deserves, which cannot establish falsity, *see Rigel*, 697 F.3d at 877. Later statements describing the program as "statistically significant," *e.g.*, ¶¶ 281, 288, were made against that backdrop and accurately described GRACE's results and GRADIENT's within-arm results.

**2. Nonactionable Statements of Corporate Optimism (Stmts. 14, 28, 31–32, 34–35, 39, 42–44, 49–52, 55, 57, 60, 65, 68)**

Plaintiffs challenge general statements of optimism about relacorilant. These include statements that "relacorilant is going to be even better [than Korlym]," ¶ 275 (Stmt. 28); *see* ¶¶ 291–92, 326 (Stmts. 42–43, 65), and that relacorilant's "combination of efficacy and safety give it the potential to become the standard of care," ¶ 329 (Stmt. 68); *see* ¶¶ 279–80, 282, 284, 288, 293 (Stmts. 31–32, 34, 35, 39, 44). These statements are not actionable. "[V]ague, generalized assertions of corporate optimism" are immaterial as a matter of law. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). They are not "capable of objective verification," so investors "know how to devalue" them. *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098–99 (9th Cir. 2022) (market was "great" and performance "tremendous"). Courts apply the same rule to drug developers. *See Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *11 (N.D. Cal. Sept. 27, 2012) (drug had "excellent" or "compelling" risk/benefit profile and trials showed "remarkable" safety and efficacy). Calling a drug "better" or saying it could become the "standard of care" is no different. No reasonable investor would rely on it.

Plaintiffs also challenge general statements about the NDA's progress. These include statements that the NDA was "progressing towards approval by the end of this year" and that relacorilant was "approaching approval." ¶¶ 305–07 (Stmts. 50–52). Statements that FDA's review "ha[d] moved per schedule" and was "moving exactly as we understood it to move" also fall into this category. ¶¶ 315, 318 (Stmts. 57, 60). Courts treat such general statements of progress as

nonactionable optimism. *See, e.g.*, *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *4 (N.D. Cal. Apr. 11, 2025) (collecting cases); *Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *8 (N.D. Cal. July 7, 2023) (drug launch was "progressing well"); *see also In re Intel Corp. Sec. Litig.*, 2025 WL 1914884, at *13 (N.D. Cal. Mar. 4, 2025) ("on track"); *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *9 (N.D. Cal. Sept. 30, 2024) (CEO statements reflecting "confidence in the development timeline are too vague for an investor to rely on"). Likewise, a drug developer's statement that it was "reasonably confident" in its response to an FDA warning letter was not actionable because it was "unspecific, subjective, and only guardedly optimistic." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 800 (9th Cir. 2017). So too here. Saying the NDA was "progressing towards approval" was the same guarded optimism, and the AC identifies no contemporaneous fact (e.g., a missed review deadline) that the schedule statements contradicted. *See In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *17 (S.D.N.Y. May 19, 2025) (statements that "approval process was progressing 'very well' and 'nicely' are not actionable" even when adverse facts existed). Even if these statements were material, they are opinions, and the AC pleads no facts suggesting any Defendant did not believe them. *See infra* § IV.A.4.

### 3. Forward-Looking FDA Approval Predictions Protected by the PSLRA Safe Harbor (Stmts. 47–48, 50–53)

The PSLRA's safe harbor generally exempts from liability a forward-looking statement, which is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues. *Intuitive Surgical*, 759 F.3d at 1058. The statements Plaintiffs challenge about the expected timing and path to FDA approval, ¶¶ 302–03, 305–08 (Stmts. 47–48, 50–53), fall into the second and fourth categories because they are "assumptions related to the company's plan for its product," *Kovtun*, 2012 WL 4477647, at *12; *see* 15 U.S.C. § 78u-5(i)(1)(B), (D). The PSLRA protects forward-looking statements if they are either (1) accompanied by meaningful cautionary language, or (2) made without "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189–90 (9th Cir. 2021). Cautionary language is meaningful if it "identifie[s] important factors that could cause actual results to differ materially from those in

the forward-looking statement" and "consist[s] of non-boilerplate warnings that [are] tailored to the forward-looking statements." *Zaghian v. Farrell*, 675 F. App'x 718, 719–20 (9th Cir. 2017). Defendants' predictions are squarely protected by both prongs of the statutory safe harbor.[5]

*First*, Defendants identified each prediction as forward-looking and accompanied it with meaningful cautionary language. Each earnings call and press release containing these challenged statements included a disclaimer identifying the discussion as forward-looking, warning that actual results could differ materially, and directing investors to the risk factors in Corcept's SEC filings. Ex. 22 at 4; Ex. 23 at 4; Ex. 24 at 4; Ex. 25 at 4; Ex. 20 at 4–5. That is what the safe harbor requires for both written and oral statements. 15 U.S.C. § 78u-5(c)(1)(A)(i), (c)(2); *see Chen v. Lyft, Inc.*, 762 F. Supp. 3d 909, 918 (N.D. Cal. 2025) (press release pointing to specific risk factors "provided a meaningful cautionary statement"). The risk factors warned of the exact outcome Plaintiffs say came to pass: that FDA might find the trials inadequate to support approval. ¶¶ 349–53. Cautionary language is meaningful when it identifies the risk that later materializes. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

*Second*, Plaintiffs do not plead any Defendant actually knew FDA would reject the NDA. FDA accepted the NDA for substantive review in March 2025. ¶ 147. Plaintiffs allege FDA voiced concerns before submission, ¶ 310, but FDA feedback related to an application that has not even been submitted does not constitute knowledge that the application will be denied. The same holds for FDA feedback provided during its application review. Plaintiffs challenge Belanoff's November 2025 statement that Corcept "expect[ed]" approval "[n]ext month." ¶ 308 (Stmt. 53). However, Plaintiffs allege only that FDA raised the liver findings as "a late review item" at the late-cycle meeting, ¶ 218, not that FDA told Corcept it would not approve the drug. Knowing that a predicted event faces surmountable obstacles is not actual knowledge that it will not happen. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1006–08 (N.D. Cal. 2008) (dismissing under

[5] Some of these statements also contain present-tense content. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Plaintiffs challenge only the forward-looking portions: that Corcept had a "path" to, was "progressing towards" and "approaching," and "expect[ed]" approval. ¶ 311. To the extent Stmt. 48 also describes the trial results and Stmt. 52 also characterizes relacorilant's efficacy and safety, Plaintiffs challenge that language separately, *see* ¶¶ 258, 291 (Stmts. 17, 42), and Defendants address it elsewhere, *see supra* § IV.A.2; *infra* § IV.A.4.

§ 78u-5(c)(1)(B) because predictions of FDA approval "were not made in the face of actual knowledge that [the drug] could never be approved," but "may have been made in the optimistic belief that [an FDA-identified] testing problem was a surmountable barrier to FDA approval"); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 533 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016).

The predictions are also opinions that Plaintiffs do not allege any Defendant disbelieved, *see infra* § IV.A.4, and a prediction of FDA approval that proves wrong is at most "a bad guess about an event that had not yet occurred," not a statement that is false when made, *Kovtun*, 2012 WL 4477647, at *13; *see In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996).

**4. Nonactionable Scientific Judgments/Opinions (Stmts. 1–46, 55, 61–83)**

Many challenged statements express Defendants' views about Corcept's clinical data regarding relacorilant's efficacy and safety and are, therefore, opinions. Opinions are actionable only in limited circumstances, not alleged here. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–89 (2015). To plead that an opinion was a misrepresentation, a plaintiff must allege both "that the speaker did not hold the belief she professed" and "that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017). To plead an omission theory, a plaintiff must identify "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 616. Under either theory, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect." *Omnicare*, 575 U.S. at 188. Reasonable investors "understand that opinions sometimes rest on a weighing of competing facts," and read a speaker's statements against "the customs and practices of the relevant industry." *Id.* at 189–90.

Those principles apply with particular force to drug developers. Interpreting clinical data is quintessential opinion: "courts within the Ninth Circuit regularly treat interpretations of clinical data as opinions." *Thant v. Rain Oncology*, 2025 WL 588994, at *4 (N.D. Cal. Feb. 24, 2025). Courts thus cannot fault a drug developer for "issuing positive and accurate opinions while 'weighing . . . competing facts,'" and investors should "not expect that *every* fact known to an issuer supports its opinion statement." *Emps.' Ret. Sys. of Baton Rouge & Parish of E. Baton Rouge v.*

*MacroGenics, Inc.*, 61 F.4th 369, 388 (4th Cir. 2023) (quoting *Omnicare*, 575 U.S. at 190). Nor is a developer's favorable view of its data false or misleading because FDA voiced contrary views during review or later. *Pardi*, 2024 WL 1056013, at *6–8; *Sanofi*, 816 F.3d at 211–14. And "disagreements over statistical methodology and study design are insufficient to allege a materially false statement." *Rigel*, 697 F.3d at 877; *see Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996). The challenged statements reflecting Corcept's scientific judgment fall into three categories.

**a) Efficacy Statements (Stmts. 1–46).** Throughout the Class Period, Defendants said GRACE's open-label results showed meaningful improvement in patients' symptoms, ¶ 252 (Stmts. 1, 4–9, 11–12), and GRACE's dropout rate reflected the severity of the disease, ¶ 244 (Stmt. 10); GRADIENT patients improved and GRADIENT's results supported and confirmed GRACE's, ¶¶ 254–64, 266 (Stmts. 13–24); patients across the trials experienced meaningful, consistent, and durable improvements, ¶¶ 272–74, 280–82, 284, 286–91, 293–95 (Stmts. 25–27, 32–35, 37–42, 44–46); and together the trials gave strong, or sufficient, support for the NDA, ¶¶ 253, 276–77, 279–87, 290–91, 294–95 (Stmts. 2, 29–38, 41–42, 45–46). Maduck summarized the same results, saying relacorilant "shows efficacy across multiple, and all signs and symptoms of Cushing's syndrome," and is "even better" than Korlym. ¶¶ 235, 275, 292 (Stmts. 3, 28, 43). Each statement expressed Corcept's view of what its data showed—judgments about the weight of the evidence.

Plaintiffs do not allege Corcept misreported any result. They instead advance two theories. The first attacks how the data were generated. Plaintiffs say GRACE's open-label phase was "unblinded, uncontrolled, and unreliable due to the large number of dropouts," ¶ 252, and that GRADIENT's favorable results came from a post hoc analysis, ¶¶ 268–71. The second attacks Corcept's confidence in the data. Plaintiffs say Corcept should not have spoken favorably about its trials while FDA had concerns, and that FDA's eventual rejection proves the favorable statements were wrong. ¶¶ 225–26, 253, 297–301. Neither theory satisfies *Omnicare*.

The first theory is a disagreement over methodology, which the Ninth Circuit has held cannot establish falsity. *See Rigel*, 697 F.3d at 877. It also fails as an omission theory because investors knew the allegedly hidden facts: Corcept disclosed that GRACE's open-label phase was

single-arm, with every patient receiving relacorilant, Ex. 1 at 3, and Corcept announced on the Class Period's first day that GRADIENT missed its prespecified primary endpoint, ¶ 184. Reading Corcept's statements "fairly and in context," a reasonable investor would understand that Corcept's favorable view reflected judgments about that data, not a claim the data were flawless. *Dearborn Heights*, 856 F.3d at 616. Nor does the post hoc analysis change anything. Corcept disclosed that GRADIENT missed its primary endpoint and submitted the analysis to FDA, which accepted the NDA with it. ¶¶ 15, 119, 147, 184, 186. How much weight a post hoc analysis of a disclosed failed trial deserves is the kind of "disagreement[] over statistical methodology" that cannot establish falsity. *Rigel*, 697 F.3d at 877; *see Kleinman v. Elan Corp.*, 706 F.3d 145, 154–55 (2d Cir. 2013).

The second theory fails because a regulator's later disagreement does not show that a drug developer's opinion was false or that it was not honestly held. *See Pardi*, 2024 WL 1056013, at *6. Plaintiffs allege no facts showing that any Defendant doubted the data, and Corcept acted on its view by submitting both trials to FDA. ¶ 278. Corcept did not suggest its view would bind FDA. When Belanoff said GRACE's results "would, on their own, provide powerful evidence," he said in the same answer that those results did not "stand on their own" and that "GRADIENT's data will support our NDA." ¶¶ 120, 253. Investors understand—and Corcept warned—that FDA, not the developer, decides what the data prove for purposes of regulatory approval. *See Omnicare*, 575 U.S. at 190; Ex. 2 at 31–32 ("Even if we deem that our product candidates' clinical trial results demonstrate safety and efficacy, regulatory authorities may not agree."); Ex. 1 at 19 (same).

*Pardi* is instructive. Although FDA had "repeatedly indicated its disagreement" with the drug developer's approach, the court held that the regulator's contrary assessment neither rendered false the developer's continued expressions of confidence in its data nor showed they were not genuinely believed. 2024 WL 1056013, at *6–7. So too here.

**b) Sufficiency Statements (Stmts. 29–31, 33, 35–36, 38, 41, 45, 55).** The same reasoning disposes of statements that the NDA was "based on positive results from" GRACE with "confirmatory evidence from" GRADIENT and that the clinical evidence was "sufficient to demonstrate [relacorilant's] safety and efficacy" or "more than sufficient." ¶ 301. The first is an accurate description of the NDA's structure, ¶ 135; the rest are Corcept's scientific judgments on

the question FDA was charged with deciding—whether the evidence was sufficient for approval. Reasonable investors understand that such a view is the sponsor's, not FDA's, and "no sophisticated investor familiar with standard FDA practice would expect that every view of the data taken by Defendants was shared by the FDA." *Sanofi*, 816 F.3d at 214; *see Pardi*, 2024 WL 1056013, at *8. Defendants' statements "cannot be misleading merely because the FDA disagreed with the conclusion—so long as Defendants conducted a 'meaningful' inquiry and in fact held that view." *Sanofi*, 816 F.3d at 214; *see Pardi*, 2024 WL 1056013, at *8. Corcept staked its NDA on the view the evidence was sufficient, and Plaintiffs plead no fact suggesting any speaker doubted that view.

**c) Safety Statements (Stmts. 61–83).** Plaintiffs challenge statements about relacorilant's safety, including that it was "well-tolerated," often "consistent with its known safety profile," ¶¶ 322–24, 327, 330–34, 336–38, 340–42, 344 (Stmts. 61–63, 66, 69–73, 75–77, 79–81, 83); that it had "an acceptable safety burden," ¶ 328 (Stmt. 67); that "no new safety signals were seen in the GRADIENT trial," ¶ 325 (Stmt. 64); that it "has significant safety benefit[s]" over Korlym and a "combination of efficacy and safety" that could make it the standard of care, ¶¶ 326, 329 (Stmts. 65, 68); and that it acted without "the serious adverse events" or "the off-target effects and toxicities that accompany currently available treatments," ¶¶ 324, 335, 339, 343 (Stmts. 63, 74, 78, 82). These express clinical judgments about the drug's overall safety profile and are opinions. *See Pardi*, 2024 WL 1056013, at *6; *Rigel*, 697 F.3d at 877–78. Plaintiffs allege these statements were false because 4 of the 303 patients developed DILI, which FDA later assessed as "probabl[y]" caused by the drug. ¶¶ 210–11, 346–47. They do not allege Corcept misreported any adverse event, or that any Defendant believed relacorilant was poorly tolerated. Their theory fails for two reasons.

*First*, statements that relacorilant was "well-tolerated" or had "an acceptable safety burden" expressed Corcept's clinical judgment about the drug's overall safety profile. *See Pardi*, 2024 WL 1056013, at *6; *Rigel*, 697 F.3d at 877–78. Plaintiffs do not allege any Defendant doubted that judgment. They rely instead on FDA's later handling of the liver data. But most statements preceded FDA raising the issue. Stmts. 61–68 were made before or at the NDA's submission, and Stmts. 69–81 came months before FDA flagged it as "a late review item" at the November 2025 late-cycle meeting. ¶¶ 218, 322–42, 428. A question raised during review is not a determination

and does not make a drug developer's clinical judgment false. Nor does FDA's eventual assessment: an opinion is not false merely because a regulator later weighs the evidence differently. *See Pardi*, 2024 WL 1056013, at *6–7. FDA reached its view only "[a]fter conducting a thorough safety review" of the NDA. Ex. 27 at 3. It assessed four cases as "probable DILI due to relacorilant," and framed part of its concern as a possibility: "more DILI cases may occur in the larger population with longer exposure." *Id.* at 3–4. Because FDA found the efficacy evidence insufficient, it said it was "unable to conduct a final benefit risk assessment." *Id.* at 3.

*Second*, Corcept had no duty to disclose more. A company "is not required to disclose every safety-related result from a clinical trial, even if it discloses some safety-related results." *Rigel*, 697 F.3d at 880–81 & n.8 (rejecting claim that company should have disclosed trial participants' liver-enzyme elevations); *see Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (no rule companies "must disclose all reports of adverse events"). As in *Rigel*, Corcept reported a defined set of safety results: relacorilant's tolerability, most common side effects, and specific toxicities it did not cause. Ex. 2 at 17–18; Ex. 1 at 3–4; Ex. 3 at 15–17; Ex. 4 at 18–19; Ex. 5 at 19–20. Read in that context, the challenged statements were not misleading without the liver data. "Well-tolerated" is a subjective opinion on the drug's overall side-effect profile; no reasonable investor would read it as a promise that no patient experienced an adverse event. The statement that relacorilant "has significant safety benefit[s]" over Korlym, ¶ 326 (Stmt. 65), compared it to Korlym's known side effects, which Plaintiffs do not allege relacorilant shares. Corcept never claimed all its safety data favored relacorilant, *contra Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706–09 (9th Cir. 2016), and it warned investors the drug "may cause undesirable side effects," ¶ 349.

The "without the off-target effects" statements are likewise nonactionable. Those statements compared relacorilant to "currently available treatments," ¶¶ 335, 339, 343 (Stmts. 74, 78, 82), and Corcept's filings identified the effects it meant: Korlym's hypokalemia (low potassium) and other treatments' QT prolongation, "a potentially deadly off-target effect," Ex. 1 at 2–3. Plaintiffs do not allege relacorilant caused either effect. And the statement that "no new safety signals were seen in the GRADIENT trial" compared GRADIENT to what Corcept had already observed "in GRACE, as well as Phase 2." ¶ 325 (Stmt. 64). Plaintiffs allege that both

trials' analysis plans named liver toxicity as a safety topic to monitor from the start. ¶ 215. A risk identified in advance and monitored throughout is not a "new" signal.

**5. Risk Factor Disclosures (Stmts. 84–88)**

Plaintiffs also challenge Corcept's risk factors themselves, *see supra* § II.D, alleging the warned-of risks had materialized because FDA raised concerns before submission, GRADIENT failed, and relacorilant caused liver injury, ¶¶ 349–58. A risk disclosure is actionable only if the plaintiff alleges facts showing that the warned-of risk had already come to pass when the warning was given. *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 189 F.4th 774, 794 (9th Cir. 2026). A disclosure is not misleading where the risk it describes "had not yet materialized" when it was made. *Id.* at 797. Nor is it misleading if a company discloses that related risks have already materialized so that its disclosures are not "entirely of as-yet-unrealized risks." *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *6 (N.D. Cal. Sept. 28, 2023) (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021)). Corcept disclosed GRADIENT's failure, ¶ 184, and told investors that FDA's input was shaping the NDA, ¶¶ 110, 112.

The event Corcept's risk factors warned of was that FDA would find the evidence inadequate and decline approval. That outcome had not occurred when Corcept spoke. FDA accepted the NDA for substantive review, ¶ 147, and did not issue its decision until December 30, 2025, ¶¶ 170–71. FDA raised its concerns before Corcept submitted the NDA and while FDA was still reviewing it. Those concerns made the outcome uncertain, which is what the risk factors warned, but they were not a decision. That is the opposite of *Funko*, where the warned-of harms "had already happened and were ongoing." 189 F.4th at 796. Continuous dialogue with FDA "is the essence of the product license application process," and investors expect a drug developer and the agency to have "differing views" about the sufficiency of the trials. *Sanofi*, 816 F.3d at 211.

Nor was the side-effects risk disclosure misleading. Corcept did not warn generically that relacorilant "may cause undesirable side effects." It warned that its product candidates "may cause undesirable side effects *that* halt their clinical development, prevent their regulatory approval, limit their commercial potential or cause us significant liability." ¶ 349 (emphasis added). A risk disclosure misleads only by implying that "the circumstance posing the risk has not yet occurred."

*Funko*, 189 F.4th at 794. So the question is whether, when Corcept spoke, a side effect had already done one of those things. None had. Even accepting Plaintiffs' allegation that Defendants knew of the liver enzyme elevations, ¶¶ 20, 218, those findings had not halted relacorilant's development, prevented its approval, limited its commercial potential, or caused Corcept liability by the time of the last challenged filing in November 2025, ¶¶ 349, 353. As noted, at that time, FDA had accepted and was still reviewing the NDA, and its decision did not issue until eight weeks later. As in *Funko*, where the warning of delay was not false because "no delay . . . had yet materialized," 189 F.4th at 797, the consequences Corcept warned of were still in the future.

**6. Statements About FDA Review (Stmts. 54–60)**

Stmts. 54–60 are the centerpiece of Plaintiffs' omissions theory, and they differ from the trial-result statements, *see supra* § IV.A.1, because they are about FDA and the review itself. Plaintiffs contend that, because FDA had cautioned Corcept in pre-submission meetings about the adequacy of the clinical program and told it to "expect significant review issues," ¶¶ 224, 320, describing the review as routine left investors with the impression approval would be easy, "when, in fact, [the] FDA had conveyed the exact opposite," ¶ 321. But FDA's alleged caution was not a decision. After those meetings, FDA accepted the NDA, ¶ 147, and the AC identifies no milestone any statement misdescribed. Plaintiffs plead no actionable omission for two reasons.

*First*, each statement truthfully described the review process, not FDA's assessment of the evidence. Guyer said GRACE was pivotal and GRADIENT supportive, which is how the NDA was structured. ¶ 314 (Stmt. 56). Management reported that FDA said no advisory committee would be needed. ¶ 317 (Stmt. 59). Robb said meetings occurred "exactly on the schedule the FDA set out" so that "[t]hings have moved per schedule," while stating "I cannot tell you . . . what transpired or the nature of our back and forth with the FDA." ¶ 318 (Stmt. 60). His description of FDA's information requests as "ordinary course routine correspondence" described the process, which remained on schedule, and his expectation that no advisory committee would be needed proved correct. ¶ 315 (Stmt. 57). Belanoff said he foresaw "absolutely no impediments to getting our NDA *in*," ¶ 312 (Stmt. 54), and FDA accepted it for review, ¶ 147. These are descriptions of timing.

Plaintiffs make much of Belanoff's and Robb's "yes" when an analyst asked whether FDA

shared Corcept's "characterization of GRADIENT . . . as a supportive study, while GRACE is the pivotal." ¶¶ 312–13 (Stmts. 54–55). But the question asked what role each trial would play in the NDA, and the answer was accurate: FDA accepted for review an NDA built exactly that way. ¶¶ 135, 147. Neither answer said FDA agreed the data would be sufficient for approval. Robb grounded his answer in FDA's "published guidance" that a single adequate and well-controlled study plus confirmatory evidence can suffice, and his view that it was "that easy an argument to present" was advocacy, not a report of what FDA thought. ¶ 313.

Plaintiffs also attempt to recast Stmts. 55 and 56 as reports that "FDA '***made it clear that***' GRACE was '***sufficient to demonstrate***' relacorilant's '***safety and efficacy***'" and "FDA had '***agree[d]***' to the roles of GRACE and GRADIENT in the NDA." ¶ 321. Read in full, neither says that. Robb attributed the sufficiency point to FDA's "published guidance"—that one adequate and well-controlled study plus confirmatory evidence can suffice—and then said "we have that in the form of our GRACE" data, ¶ 313; that is a report of a published standard, not a private FDA ruling. And the trial-role "agreement" in Stmt. 56 was confirmed when FDA accepted for review an NDA with exactly that structure. ¶¶ 135, 147. Corcept did not represent FDA had no concerns; it accurately described the NDA's structure and the guidance on which it relied. *See Pardi*, 2024 WL 1056013, at *9; *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 40 (1st Cir. 2017).

Corcept did not conceal that FDA had views, or that FDA's input was shaping the program. *See supra* § II.C. It announced that it designed GRACE "[b]ased on FDA feedback." ¶ 62. Plaintiffs allege Corcept "never disclosed ***the reason why*** GRADIENT had shifted from not being a part of the NDA to now becoming a part of the expected submission." ¶ 109. But Corcept publicly explained that it would include GRADIENT data "based on our discussions with the FDA," a decision made "after that back and forth" with FDA. ¶¶ 110, 112, 372. It likewise attributed GRADIENT's endpoint change to consultations with FDA. ¶¶ 115, 373. Investors therefore knew that Corcept was in an ongoing dialogue with FDA and that FDA's input was changing the program.

*Second*, Plaintiffs' real complaint is that Corcept did not report what FDA said in those discussions. But Corcept had no duty to report FDA's interim feedback. "To the contrary, the FDA approval process necessarily involves a dialogue between companies like [Corcept] and the

Agency, and the company has 'no legal obligation to loop the public into each detail of every communication with the FDA.'" *Pardi*, 2024 WL 1056013, at *7 (quoting *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *7 (N.D. Cal. June 4, 2018)). Not disclosing the subject of an ongoing dialogue is not a material omission unless that dialogue was "highly unusual" or "so contradictory" to the company's statements about approval. *Dynavax*, 2018 WL 2554472, at *7. Plaintiffs do not allege any non-conclusory facts of that kind. At most, they allege FDA expressed concerns about the "adequacy of the clinical development program," ¶ 320—a commonplace subject of FDA meetings—not a specific undisclosed finding contradicting a specific statement. And Corcept disclosed the adverse fact Plaintiffs allege mattered most: GRADIENT's failure. ¶ 184. That FDA ultimately found the evidence insufficient to support approval does not render Corcept's statements about the status of the review process false. *See Pardi*, 2024 WL 1056013, at *8.

**7. Analyst Reports (Stmts. 10, 30, 49, 58, 59)**

Five challenged statements come from analyst reports, not from Defendants. ¶¶ 244, 277, 304, 316–17 (Stmts. 10, 30, 49, 58–59). Each attributes its account only to unnamed "management." The PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1), and Rule 9(b) requires pleading the "who, what, when, where, and how" of each alleged misrepresentation, *Apollo*, 774 F.3d at 603–05. An analyst's paraphrase of an unnamed speaker does not meet that standard. Only a statement's "maker" can be liable; when another conveys it to the market, "attribution is necessary." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 147 n.11 (2011). Because neither the AC nor the analysts attribute these statements to any Individual Defendant, none can be liable for them.

**B. Plaintiffs Fail to Plead a Strong and Compelling Inference of Scienter**

The PSLRA requires that a complaint plead particularized facts giving rise to a "strong inference" that each defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A); *Rigel*, 697 F.3d at 876. That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Scienter means intentional misconduct or "deliberate recklessness," which is itself "a form of intentional or knowing misconduct"; "even inexcusable negligence" is not enough. *In re Silicon*

*Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974, 976 (9th Cir. 1999). It is an "exacting" pleading obligation that "presents no small hurdle for the securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quotation omitted).

Courts first "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (citing *Zucco*, 552 F.3d at 992). "If none is sufficient alone, [the court] then consider[s] the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.* None of Plaintiffs' allegations supports a strong inference of scienter.

**1. The Individual Defendants' Trading Does Not Support Scienter**

The AC's scienter theory leans heavily on stock sales, alleging the Individual Defendants collectively sold more than $69 million in Corcept stock during the Class Period because they knew FDA would reject the NDA. ¶ 437 & AC Table 1. Insider sales support scienter only when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (quotation omitted). Courts consider the amount and percentage sold, timing, and prior trading history. *Metzler*, 540 F.3d at 1067. No single figure is dispositive. *See id.* Here, every factor favors Defendants.

*First*, Plaintiffs omit what share of his holdings any Individual Defendant sold—important context because courts give "great weight to the percentage of stock sold." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *see Metzler*, 540 F.3d at 1067 (rejecting insider-sales inference despite sales of 37% of one defendant's holdings); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (sales of 3%, 12%, and 13% "modest to de minimis"). Defendants' SEC disclosures put Plaintiffs' dollar figures in perspective: using the alleged sales, remaining reported common shares, and year-end exercisable options, the percentages are approximately 4.7% for Belanoff, 1.2% for Robb, 16.3% for Maduck, and 27.7% for Guyer. *See* App. 2; Exs. 7–10, 15. Considered together, the Individual Defendants sold approximately 7.8% of their holdings during the Class Period. *See id.* Those percentages are not suspicious and undercut Plaintiffs' scienter allegations.

*Second*, the Individual Defendant-specific trading histories show nothing unusual.

Plaintiffs' headline comparison, that the Individual Defendants took in "nearly seven times" more during the Class Period than in an equal-length "Control Period" before it, measures sale proceeds, not the amount of stock sold. ¶ 432. Most sales were of share amounts fixed by the Individual Defendants' Rule 10b5-1 trading plans, so proceeds rose with the stock price. ¶¶ 132, 166–67, 449. Measured in shares, the increase is about two and a half times, and most of it comes from Belanoff. *See* AC Table 1. Robb sold less during the Class Period (21,399 shares) than during the Control Period (48,694). ¶ 436. Belanoff sold only under his Rule 10b5-1 plan during the Class Period, on a fixed monthly schedule. ¶¶ 448–49. That he sold nothing in the Control Period does not change the analysis. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346–47 (10th Cir. 2012) (automatic sales and substantial retained holdings "rebut[ted] any inference of scienter" even where "defendants had not traded . . . in the prior two years"); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890–91 (4th Cir. 2014) (increased class-period sales not suspicious where made under Rule 10b5-1 plans, including one adopted during the class period). Nor were Belanoff's sales timed to the peak: only about 11% of his Class Period sales occurred near the March 2025 high, with most sales occurring later at lower prices. ¶¶ 169, 433, 441, 444; *see Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2023 WL 4418886, at *8 (N.D. Cal. May 24, 2023) (even where defendant "capitalized on the momentary spike" in stock price, "this does not support a strong inference of scienter where the bulk of [his] trades during the Class Period were at lower prices"). Belanoff also kept more than 2.9 million shares through the CRL. Ex. 7.

Plaintiffs also cannot rely on aggregate figures. The $97,296,724 pleaded "across the Insider Executives" includes sales by three non-defendants. ¶ 437 & AC Table 1. Those sales "are irrelevant to the determination of the named defendant's scienter." *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011). And the $69,047,221 attributed to the Individual Defendants proves nothing on its own: "large numbers do not necessarily create a strong inference of fraud." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002).

*Third*, "the vast majority of the Individual Defendants' sales occurred pursuant to Rule 10b5-1 trading plans," ¶ 447, undercutting any inference of opportunistic timing, *see Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1058 (N.D. Cal. 2018) ("In general, automatic

sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter." (citing *Kovtun*, 2012 WL 4477647, at *21)); *Metzler*, 540 F.3d at 1067 n.11. Robb and Maduck adopted plans before the Class Period, ¶¶ 134, 452–53, and Belanoff and Guyer adopted plans in November 2024, shortly after it began, ¶¶ 448, 450. Corcept disclosed those adoptions, Ex. 1 at 40, and the challenged plan sales followed planned schedules, *see* ¶ 449.[6]

Plaintiffs discount Belanoff's and Guyer's plans because they were adopted during the Class Period. ¶¶ 448, 450.[7] But a plan adopted during a class period supports scienter only if the complaint pleads facts showing the plan itself was suspect—for example that it was amended to sell more stock or that its "purpose . . . was to take advantage of an inflated stock price." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 n.4 (2d Cir. 2022) (quotation omitted); *see In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *12 (N.D. Cal. Feb. 17, 2010); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y. 2018). Without such facts, a complaint fails to plead that a plan was not "entered into in good faith" or was "part of a plan or scheme to evade" the insider-trading rules. *Bristol-Myers*, 28 F.4th at 356 n.4 (quoting 17 C.F.R. § 240.10b5-1(c)(1)(ii)). The AC pleads neither. It alleges no amendments and challenges adoption based only on Belanoff's and Guyer's alleged knowledge of FDA concerns, from which Plaintiffs infer their certifications were missing or false. ¶¶ 448, 450. That is the same deficient knowledge theory addressed below. *See infra* § IV.B.2. Nor do plans adopted weeks into the Class Period and months before the March 2025 stock peak suggest an effort to exploit an inflated price.

The few discretionary sales do not muddy the picture. Guyer made one, for 4,500 shares, ¶ 451, less than 1% of his holdings, and still reported 549,000 shares, including exercisable options, after the CRL. Ex. 15 at 10, 11 n.14. Robb's non-plan sales were modest and plainly not timed to capture an inflated price. ¶ 452. The first was at $56.20 per share. Ex. 11. The others were in the

[6] Every Class Period sale by Belanoff and Maduck was made pursuant to their plans. Exs. 7, 10. Guyer sold just 10,000 shares before adopting his plan, less than 5% of his Class Period sales. ¶ 129.

[7] Even though Maduck's plan was adopted before the Class Period started, Plaintiffs also attack the timing as suspicious. But Plaintiffs' only specific allegation about Maduck's plan is that he adopted it two days after Corcept amended GRADIENT's protocol. ¶ 453. That amendment was public: Corcept posted it on ClinicalTrials.gov and told investors about it. ¶ 115. The rest, including that Maduck knew of "FDA's concerns," is conclusory. ¶ 453.

low-to-mid $70s, significantly below the stock's Class Period high of $117.33. Exs. 12–14; ¶ 169. Together they totaled about 10,400 shares, roughly a fifth of the 48,694 shares he sold in the fourteen months before the Class Period. ¶¶ 436–37 & AC Table 1. When insiders "miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

**2. The Remaining Scienter Allegations Fare No Better**

Plaintiffs' remaining scienter theory rests largely on the Individual Defendants' roles. Plaintiffs allege Belanoff was "completely involved" in the NDA, Guyer led clinical development, and Guyer and Robb "sat at the top of the internal body that built" the NDA. ¶¶ 390, 392, 398. They infer from those roles that each knew FDA would reject the NDA. ¶¶ 403, 417–18. But a senior executive's position, access to trial data, and scientific expertise do not show knowledge that a statement was false. *See Rigel*, 697 F.3d at 876–77.[8]

Plaintiffs invoke relacorilant's importance, alleging it was the Company's future, the drug meant to replace Korlym and generate "$3 billion to $5 billion" in annual revenue, so Defendants must have known everything about it, and therefore that FDA would reach the conclusions expressed in the CRL. ¶¶ 379, 472. But this "core operations" theory works only in the "exceedingly rare" case where it would be "absurd" for management to claim ignorance of a problem. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 & n.3 (9th Cir. 2008). It requires "specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Lyft*, 762 F. Supp. 3d at 919 (quoting *Intuitive Surgical*, 759 F.3d at 1062). This is not a case like *Mulligan v. Impax Laboratories, Inc.*, where it would be "absurd" to think executives would be unaware of conditions "pervading" the company's manufacturing operations and repeated FDA Form 483s and a warning letter. 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014). Defendants do not deny knowing the trial results or FDA's questions. They disclosed GRADIENT's failure and submitted the full data to FDA. The issue is whether Defendants believed their statements about those facts

[8] Plaintiffs do not even attempt that showing for Maduck, whose challenged statements repeat publicly reported trial results or compare relacorilant to Korlym. ¶¶ 235, 275, 292, 326. Plaintiffs allege he already had adverse information, but never identify what he knew or when. ¶¶ 382, 453.

were false, and product importance does not answer that question.

If anything, relacorilant's importance cuts the other way. If its approval was an "existential imperative," ¶ 467, Defendants had every reason to pursue an application FDA would approve, and none to pursue one they knew would fail. As the Ninth Circuit held in *Nguyen* when plaintiffs alleged executives "promise[d] FDA approval [they] knew would not materialize," "[t]he theory does not make a whole lot of sense," because "'[i]t is improbable that [a company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.'" 962 F.3d at 415–16 (quoting *Cozzarelli*, 549 F.3d at 627).

To bridge that gap, Plaintiffs need particularized facts: a report, meeting, communication, or admission showing a particular Defendant believed a particular statement was false when he made it. None of Plaintiffs' attempts to supply those facts does the job.

**a) Attending FDA Meetings.** Plaintiffs allege the Individual Defendants attended meetings where FDA raised clinical-program concerns and had access to meeting minutes. ¶¶ 362, 369–79. Neither shows they knew FDA would reject the NDA. Questions are routine and concerns are not decisions. *See Pardi*, 2024 WL 1056013, at *6–9. And "access to information alone is insufficient to show scienter." *Petersen v. TriplePoint Venture Growth BDC Corp.*, 2024 WL 5384678, at *12 (N.D. Cal. Aug. 7, 2024) (citing *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021)); *see Intuitive Surgical*, 759 F.3d at 1063. The CRL says FDA raised clinical-program concerns "on several occasions" and told Corcept to expect significant review issues. ¶ 224. But the AC does not allege FDA had decided to reject the NDA, told Defendants their study descriptions were false, or gave any warning known to a speaker before a challenged statement. That distinguishes cases where executives received direct notice of facts they concealed. *Cf. SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024). And Defendants told investors throughout the Class Period that they were in regular contact with FDA and when FDA's feedback influenced program changes. ¶¶ 371–76; *see supra* § II.C. Those facts support the inference that Defendants treated FDA's "concerns" as issues to address, not as a decision already made. *See Tellabs*, 551 U.S. at 324; *Nguyen*, 962 F.3d at 417.

**b) The GRADIENT Analysis.** Plaintiffs allege that after GRADIENT missed its primary

endpoint, Corcept ran a new analysis that was not in the trial's prespecified plan and cited the results as support for relacorilant. ¶¶ 180–91, 268. They say Defendants ran it to cover up the failure. ¶¶ 185–86. But Defendants announced the failure and put the new analysis in the NDA, in front of a regulator certain to scrutinize it. ¶¶ 184–86. That is what executives do when they believe an analysis has value, not when they know it is a cover-up. *See Rigel*, 697 F.3d at 885.

**c) "Premature" Trial Halt.** Plaintiffs' allegations that Defendants "prematurely stopped" the trials to "force an NDA submission by 2024," ¶¶ 479–89, fare no better. Ending enrollment is a disclosed clinical-program decision; the AC identifies no FDA statement that more patients were required, and Corcept submitted the resulting data to FDA, which accepted the NDA for substantive review. ¶ 147. A decision to file on the existing data is evidence Defendants believed the data sufficed, not that they knew it did not. *See Nguyen*, 962 F.3d at 415–16.

**d) Confidential Witness Accounts.** The AC devotes over fifty paragraphs to summarizing the opinions of unidentified FEs. When a complaint relies on confidential witnesses, it must describe their statements with "sufficient particularity to establish their reliability and personal knowledge," and those statements "must themselves be indicative of scienter." *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *18 (N.D. Cal. Sept. 18, 2024) (citing *Zucco*, 552 F.3d at 995). The AC fails these requirements.

*First*, no FE describes what FDA said to any Defendant, or what any Defendant believed. None allegedly attended any FDA meeting. ¶¶ 41–43, 386, 397–402. FE-1's claim that Belanoff and Robb attended FDA meetings and approved Corcept's responses, ¶¶ 386, 394, concerns only what Defendants themselves disclosed—regular contact with FDA, ¶¶ 371–76—and extends to meetings after FE-1 left based only on "experience at Corcept and Company practice," ¶¶ 41, 98, 156, 397. The other attendance allegations are rumor: FE-2 asserts Guyer's attendance was "commonly known," ¶ 399, and FE-3, who left before the Class Period, repeats what a colleague who "likely attended" a 2018 meeting said years earlier, ¶¶ 43, 402—a meeting whose outcome (adding a placebo-controlled phase) Corcept disclosed, ¶¶ 61–62. The AC attributes claims that FDA's concerns were "communicated to Corcept well before submission" and that FDA wanted a larger sample size to FE-2—a data manager removed from the program in 2023, ¶¶ 88, 483—but

pleads no source, date, document, or recipient, ¶ 484. Alleging a Defendant attended a meeting without pleading what was said there does not show what he knew. *See Nguyen*, 962 F.3d at 416–17 (account insufficient where complaint did "not plead any details about these reports"); *Intuitive Surgical*, 759 F.3d at 1063 (rejecting accounts that "lack first hand knowledge regarding what the individual defendants knew or did not know"); *NVIDIA*, 768 F.3d at 1061 ("unspecific and speculative" accounts); *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *4 (N.D. Cal. Dec. 1, 2004) (witness "apparently ha[d] no firsthand basis for this information but relie[d] instead on an unnamed source"); *Palo Alto Networks*, 2025 WL 1093247, at *5 (similar).

*Second*, what the FEs purportedly observed is either ordinary or opinion. FE-1 and FE-2 describe an NDA process with a firm deadline, a reshuffled regulatory team, many protocol amendments, information requests routed through regulatory staff, and three "waves" of FDA questions rather than the "typical" one or two. ¶¶ 97–99, 136, 155, 389, 393–96, 400. A demanding timeline and active review are common NDA features, not evidence that executives believed their statements false. FE-1's assertion that a manager "had concerns over how" the Head of Biometrics "handled data," ¶ 137, and FE-2's view that staff turnover and piecemeal circulation of FDA requests were "weird," ¶¶ 154–55, reflect at most "some disagreement within the corporation," which does not establish scienter, *Zucco*, 552 F.3d at 998. The rest is speculation: FE-2 calls approval "a coin toss" based on "educated inferences" from a blinded trial, ¶ 88; FE-1 and FE-2 infer bad news from stock sales, ¶¶ 151–52; and FE-3 opines about liver scans Corcept "should have" run, ¶ 426. None supplies a particularized fact about any Defendant's knowledge or belief. FE-2 voiced doubts only to a supervisor two levels below Guyer. ¶¶ 42, 87–88. FE-2's belief that being "parked" in 2023 and laid off in 2026 resulted from those doubts, ¶ 483, is supposition, not a pleaded fact tying any Defendant to either decision. No FE allegation concerns Maduck at all.

*Third*, several FE accounts affirmatively support the innocent inference. FE-2 claims enrollment was closed on a fixed calendar date by senior management, ¶¶ 86, 485, and FE-1 that the year-end submission deadline came from Belanoff through Robb, ¶¶ 99, 463. But Corcept publicly announced both the enrollment close and its submission target, ¶¶ 80, 302, and executives who file an NDA on a self-imposed deadline, submit every analysis to the agency, and route every

FDA response through senior management are acting on a belief that the application can succeed, *see Nguyen*, 962 F.3d at 415–16. And FE-1 places the first clinical information requests in February through April 2025—*after* FDA accepted the NDA for substantive review. ¶¶ 147, 395.

**e) Executive Compensation.** Plaintiffs next point to bonuses tied to completing the Phase 3 trials and submitting the NDA. ¶¶ 455–63. Compensation tied to clinical and regulatory milestones is standard at pharmaceutical companies. If such bonuses supported an inference of fraud, nearly every drug development executive would face that inference. Courts consistently reject motive allegations of that generalized kind. *See, e.g.*, *Rigel*, 697 F.3d at 883–84; *Kovtun*, 2012 WL 4477647, at *20; *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 999 (D. Ariz. 1999).

Plaintiffs' own theory also defeats the argument. They allege the bonuses rewarded *submitting* the NDA "regardless of whether the NDA eventually resulted in FDA approval." ¶¶ 459, 461. Corcept submitted the NDA in December 2024 and announced it publicly. ¶ 135. Under Plaintiffs' account, the bonuses were earned at submission. That gave no Defendant any reason to mislead investors about approval prospects afterward—the subject of the challenged statements.

* * *

Nor do Plaintiffs' allegations support a strong inference of scienter when considered holistically. *See CareDx*, 2024 WL 5399664, at *23. As a general matter, Plaintiffs' theory offers no plausible reason for Defendants to lie. Securities fraud typically involves hiding something the market cannot see (e.g., inflated revenue, phantom demand) to keep the stock price up for as long as the concealment lasts. Here, there was nothing to hide. Whether FDA would approve relacorilant was FDA's decision to make, and the answer was always going to become public. Misstating the odds of approval could buy, at most, a few months of a higher stock price before an unavoidable reckoning. The Ninth Circuit previously rejected the same theory because it "does not make a whole lot of sense." *Nguyen*, 962 F.3d at 415. And "the lack of a plausible motive makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova*, 993 F.3d at 1108.

At most, the theory "might" make sense if insiders were cashing out before the truth came out. *Nguyen*, 962 F.3d at 415. Even the example *Nguyen* cited—insiders selling stock while a critical study was pending, with no indication of a trading plan—did not support a strong inference

of scienter. *Id.* at 416 (citing *Cozzarelli*, 549 F.3d at 622, 627–28). The AC must plead clear facts showing Defendants were in fact cashing out, but it does not. As shown above, most sales were made under pre-set plans, spread across the Class Period at prices well below peak, and roughly in line with past trading in share terms. The rest—bonuses, secondhand FE accounts, job titles, and the drug's importance—add volume, not a coherent scienter theory. The more plausible inference is the obvious one: Defendants believed in relacorilant, said so, and were disappointed when FDA disagreed. *See Tellabs*, 551 U.S. at 323–24; *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 996 (N.D. Cal. 2025) (hindsight cannot convert a mistaken business decision into falsity).

### C. Plaintiffs Fail to Plead Scheme Liability

Rule 10b-5(a) and (c) require deceptive conduct beyond misstatements. Plaintiffs cannot repackage alleged misstatements and omissions as a scheme. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1017–18 (9th Cir. 2018). None of the "acts" listed in Count II, ¶ 522, is deceptive conduct distinct from the alleged misstatements. "Disseminating" the challenged statements and failing to disclose FDA's feedback are Count I restated. "Rushing" to submit the NDA and ending enrollment describe business decisions that were publicly announced, and an openly disclosed act cannot create a "false appearance of fact." *Simpson*, 452 F.3d at 1048. The allegations that Defendants ignored or acted against employees who questioned the trials and kept FDA's feedback from employees describe internal management, not deception of investors, and the AC pleads no particulars of who did what, when, or to whom. And insider sales are the basis of Count IV, not a deceptive device. Because none of these acts is independently deceptive, and because the AC fails to plead any statement was false or misleading and fails to plead scienter, Count II fails.

### D. Plaintiffs Fail to Plead Control-Person or Insider-Trading Liability

Plaintiffs' Section 20(a) and Section 20A claims fail because the AC fails to plead a predicate Exchange Act violation. *Zucco*, 552 F.3d at 990; *Reckstein Family Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 992 (N.D. Cal. 2024). Counts III and IV should be dismissed with Counts I and II.

## V. CONCLUSION

Defendants respectfully request the Court dismiss the AC with prejudice. If the Court grants leave to amend, it should bar new claims and require Plaintiffs to cure the specific defects identified.

DATED: October 23, 2026

Respectfully submitted,

**KING & SPALDING LLP**

By: */s/ Rachel Yeung*

RACHEL YEUNG (SBN 317361)
*ryeung@kslaw.com*
MARK A. KIRSCH (admitted *pro hac vice*)
*mkirsch@kslaw.com*
JEFFREY S. ROSENBERG (admitted *pro hac vice*)
*jrosenberg@kslaw.com*
THOMAS E. SPIEGLER (admitted *pro hac vice*)
*tspiegler@kslaw.com*

Counsel for Defendants CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, WILLIAM GUYER, GARY CHARLES ROBB, and SEAN MADUCK